lawyers adhering to our time schedule or our clock, which is when the yellow light comes on you have two minutes left in your argument or when the red light comes on we ask you to conclude your remarks unless you're answering a question from the court. We have read the briefs and record excerpts. We're not necessarily familiar with all the record, so we do appreciate record citations when you can give those to us. With that, we call the first case United States v. Diaz, 23-30751. Mr. Larson. Good morning, your honors, and may it please the court. By the time that William Bennett testified for the government as its most important witness in Diaz's prosecution, five of his colleagues at FNBC had already been charged with bank fraud. Ashton Ryan, the bank's president, Bill Burnell, the bank's chief credit officer, Robert Calloway, an executive vice president, Fred Beebe, a senior vice president, and Gregory St. Angelo, the general counsel for the bank. And four of them had been convicted by April 19, or 2023. Unquestionably, Bennett was aware of those prosecutions, and he was aware that those defendants had been prosecuted by the very same people who wanted his cooperation as a witness in Diaz's case. But what we don't know is whether Bennett knew that at least three of those four had been accused of criminal conduct that included misrepresentations or omissions in statements to FDIC examiners about the purpose of the loans that were being made to major borrowers. And this was something that Bennett himself had done. And we don't know that because Counsel for Diaz wasn't allowed to ask that. And Counsel for Diaz wasn't allowed to ask whether Bennett was attempting to curry favor with the government because of a fear of prosecution. He did cross-examine him about that, didn't he? No, he did not, Your Honor. It said he was a target or something? Judge Afric is not like that. He wasn't totally excluded from that. What he was not allowed to do, Your Honor, was to make the connection between his conduct, Bennett's conduct, and the conduct of these other three people who had been criminally prosecuted. He was allowed to question Bennett about the errors and the omissions. And then when he attempted to question Bennett about the factual bases for the other prosecutions, specifically of Burnell and Calloway, the judge said no, based on the government. Would that have made any difference to Diaz's guilt or to the jury's evaluation of Bennett's credibility? Well, it would have made a difference because if the jury found that Bennett was not credible, Bennett was the only person, the only witness at trial, who offered critical testimony as to two things. The bank's, quote, reliance on the invoices and the but-for causation factor of by means of. Those two elements basically rested solely and exclusively on Bennett's testimony. And so what you had here was a basic violation of the right to confrontation under the Sixth Amendment. And this complete limitation on a well-established right to prove bias was the result of the government's efforts, which was embraced by the district court, to keep any references to the criminal debacle that was FNBC out of the courtroom. And while the court certainly had the right to limit cross-examination, that right comes into play only after basic Sixth Amendment rights have been satisfied. This court in Green v. Wainwright and Restivo both basically said that you don't look to questions of abuse of discretion as to limitations on cross-examination until basic Sixth Amendment rights have been satisfied. Let me ask you a question. The invoices came in, did they not? They did, Your Honor. And there was no evidence that Mr. Deaton, his confederates, because he was convicted of conspiracy, there was no evidence that they just suddenly started voluntarily sending in invoices, right? That's correct, Your Honor. They sent them in because the bank threatened him that he had, that they were going to do something with his line of credit if he didn't start showing how he was using the money. That's correct, Your Honor. But what we don't know is— So how did Bennett's testimony have anything to add to that? Well, it's not a question of that, Your Honor. It's a question of the elements of material—I go back to the elements of materiality, and I go back to the elements of by means of. And what you have in this case, Your Honor, is Bennett was, again, I reiterate, he was the only witness who could establish those two things. He was essentially the bank's representative. And the irony of that is he wasn't even Glenn Diaz's loan officer as he conceded at trial. And so we have someone who's not Glenn Diaz's loan officer testifying about what the bank did or would have done trying to establish materiality, and Glenn Diaz is absolutely prohibited from questioning him about his fear of criminal violence. And if we look at those two cases where there has been an absolute curtailment of questioning with regard to bias, that's a violation of the Sixth Amendment, and you have to go to the Delaware v. Van Artsall factors. And if you go down those factors, in this case, you will see that four of them go directly against the government in this case. Even if that's so, there's still a harmless error component, right? That is correct, Your Honor. And just running through the factors very quickly, Bennett was the most important witness. His testimony was most assuredly not cumulative. There was no one to corroborate most of his testimony. And while there was cross-examination on other points with Bennett, there was no cross-examination whatsoever on bias, motive, or criminal exposure. And that is what is so critical in this case. And I would point out that when you get to the harmless error test, that is the harmless error test. And the only thing, the only fact . . . No, because look, you could have a totally irrelevant witness, and the judge could limit cross-examination, and there would still be in light of the whole trial, right? There could be, Your Honor. But once again, you come back to the Van Artsall test, and that is what determines whether the error is harmless. Once you've established the violation, which we have, you have to reach the harmless error test. You have to employ Delaware v. Van Artsall, as this court held in Landerman and in the Jimenez case, which Your Honor, Judge Barksdale sat on. And the question is, was this harmless? And it's not a sufficiency of the evidence case. The last factor, as this court made clear in Landerman and Jimenez, doesn't turn on sufficiency. What it turns on is if you assume that the full value of the cross-examination had been realized, and in this case, that would have been destroying the credibility, frankly, of William Bennett, because it was clear that if he wasn't terrified of being prosecuted, he should have been. Has he been indicted? No, he has not, Your Honor. But the government got what it wanted at trial. It had a perfectly clean witness, one who hadn't been indicted, but one who happened to do exactly what three other people it had indicted did at the bank. And this error was bookended by two other errors in this case. The first was, I believe, the district court's basic misunderstanding of the factor of materiality. Materiality is not an objective standard. It is a standard that is determined, the materiality in any given case is determined by reference to the institution or the entity to which the statements are made. And that, in this case, had to be FNBC. I'm saying because the whole institution was rotten to the core. It didn't make a difference that the invoices were also rotten to the core. No, I'm not saying that. There's no question that the invoices were false, Your Honor. The question is, what were the bank's practices and policies? And if the bank had been an impeccable bank, fine, you take those practices and policies. You know, we can make that argument if we didn't pay our taxes, too, because they're so sloppy in enforcing the tax law. But I don't think that goes very far in regard to materiality. But when the jury is instructed one way, Your Honor, and the court has ruled another way with regard to the evidence that you can produce at trial, you have this dichotomy. And you have a dichotomy in which Glyn Diaz was preventing from arguing, look, this is what the bank did. You, the jury, which is the fact finder for the question of materiality, not the judge, you, the jury, have the right to decide whether to FNBC these invoices were material. And if they said yes— What's your best case for your theory of materiality? Netter v. United States. Well, I don't think Netter said—well, it's a jury issue. It is a jury issue, absolutely. But you're not—that's not the problem here. You're saying materiality is sort of like the shell plaintiff. Depends on the receptiveness of the person who hears the information. I'm not saying that, Your Honor. The Supreme Court's saying that. No, I don't—well, you'll have to give me a pin site for that. Well, I will, Your Honor. And also, the jury— But you're making the argument that the jury was erroneously instructed. No, I'm arguing that they were correctly instructed by the Fifth Circuit's instructions. What was incorrect was the judge's statement at the very beginning of trial, which had an impact both on opening statement and the ability to call Mr. Gibbons the expert witness, that materiality was an objective standard. It's not. It's a standard that's created by reference to the entity to which the statements are made. And that becomes the issue, Your Honor. And so opening statement was interrupted first by the government, the second time by the court. The witness—the expert witness— What's your best bank fraud case for that idea of materiality? With regard to a specific bank fraud case, I don't have one, Your Honor. I'm happy to submit a supplemental brief. Well, I think you ought to do that because, you know, if you were talking about defrauding some consumer in an auto loan, that might be more pungent to me. But when you talk about the bank fraud statute, it's a bank until it's not a bank. So are you going to differentiate among banks or among individual banking officers within the banks in doing their credit ratings as to was it—was it material to Officer A? Actually, Your Honor, I do have a case. It's United States v. Campbell. It is cited in our briefs. I argued it to this court approximately 15 years ago, and this court reversed John Campbell's convictions. So you're running out of time. Do you want to do your sentencing argument? Because you've at least got a circuit split there. Yes, if I— It's up to you. Up to you how you allocate. Yes. The question in this case is the use of intended loss, as we all come down to that. And while I would like to be able to say— We'll just cut to the chase, given the time. Would you agree that we can look to the commentaries to supplement the meaning of the guidelines? Under Vargas, you can, Your Honor. So speaking of Vargas, why is this not a slam dunk for the government under Vargas? It is a slam dunk in front of this panel, Your Honor, because of Vargas, that the court can look to the commentary. It's absolutely a slam dunk for the government. With regard to that specific component of the issue, the question is whether Loper-Bright had an impact on the whole Stinson light of cases. And I'm contending—and I'm explicitly—overruled the Stinson line of cases. But what I am saying is that this court— Didn't explicitly. We can agree on that. I'm sorry? It didn't explicitly. It said implicitly or explicitly. It didn't explicitly. Right. And then in terms of implicitly, didn't we say in Vargas, as we've said repeatedly, we don't underrule Supreme Court cases? Yes, you did, Your Honor. But we don't even need to reach that issue because I think it was simply error for the court to rely on intended losses in this case. There was security for the loan, and when there's security, actual losses are the better measure under the Goss decision. The intended losses in this case included conduct for which Diaz was not convicted, which is improper. You can't sentence somebody for conduct that's not criminal. That's basic Fifth and Sixth Amendment. And there was no— So now you're saying there's just not the evidence for intended loss, but you're sort of accepting that at least the purposes of our panel, we get to look at intended loss? Yes. Okay. But you get to look at intended loss if that was the right decision for the district court to make, because it's not just a question. The court can look to the greater of intended loss or actual loss, but there are exceptions to that rule. And the exceptions to the rule are created by cases like— He ended up borrowing $22 million that wasn't repaid, right? That's correct, Your Honor. Well, so why couldn't the court have sentenced him for a $22 million loss? Because that wasn't the scope of the criminal fraud, Your Honor. Intended loss absolutely has to be limited by criminal conduct. Thank you. All right. Okay, Mr. Payne. Your Honors, may it please the Court? I'm Matthew Payne. I'm out of the United States. I was trial counsel in this matter. This was a textbook case of bank fraud, Your Honors. The evidence of trial established that Mr. Diaz, along with two of his associates, Peter Genovine and Mark Grelley, defrauded the bank by misrepresenting how they were spending the bank's money. The bank had instructed him specifically, no more overdrafts unless you're going to use the bank's money in order to preserve and improve part of the bank's collateral. That was a Florida warehouse owned by Mr. Diaz. In response, Diaz provided false invoices, false payroll, and false credit card itemizations in which he represented he was spending that money on the warehouse when, in fact, he was spending the bank's money on vintage cars, plastic surgery, precious metals, and other personal expenses. Addressing, I think, the first issue raised by my opposing counsel was the Confrontation Clause, and I believe Mr. Larson explained that this was an absolute curtailment of cross-examination of Bank Officer Bennett. We would disagree. In fact, it was a very thorough cross-examination of Bank Officer Bennett. Bill Bennett was the Bank Officer for Mr. Diaz's loans, and for about two hours, Mr. Diaz's counsel cross-examined Mr. Bennett regarding his handling of Mr. Diaz's loans. Explained in detail, some things that were elicited were that Mr. Diaz's loans were used to pay interest by the bank, that his loan memos did not state anything about using loan proceeds to pay interest, and neither did the disbursement agreement, that Diaz was allowed to write checks, and then the loan would be issued to fund the checks he wrote, which was not a normal banking practice. There would be last-minute instructions to get Mr. Diaz's loans, and at least one loan may have been booked without Mr. Diaz's signature. So there was no question to the jury that Mr. Bennett was not a flawless banker. He had some failings that were made very clear. It was only after about that two hours that the court restricted that cross-examination, specifically when it verged into the conduct of other officers, to compare Mr. Bennett's conduct to those other officers. Mr. Diaz could have continued, I believe, cross-examining Mr. Bennett, saying, you may have done something wrong on these loans. You may have possibly committed a crime. That wasn't pursued. It was to turn the focus for the jury to the other officers and other loans. That was appropriate to limit that cross-examination because, again, not only was it irrelevant, it would be confusing and possibly misleading to the jury. I acknowledge also, as far as the materiality argument, Judge Malazzo properly delimited Mr. Diaz's argument regarding the malfeasance of the other bank officers. I believe that Mr. Larson explained that the judge had limited the presentation of evidence regarding the debacle of FirstNBC Bank, and it was debacle. A jury would have been misled and confused by going into all of these other unrelated loans or conduct by officers. Instead, the court limited that. It would be tantamount to victim blaming. It's worth reminding everyone that the victim here is an FDIC insured institution, not bank officers. Excuse me for referring to Judge Malazzo as Judge Afric. Mr. Larson blamed the Campbell case. Yes. Is there anything factually similar in that? No, there's not. Campbell case was the matter where the bank officer and his son had provided some mortgage records, and the court's reversal of that specifically involved whether or not the defendant was actually involved or had any knowledge. Materiality wasn't raised in that specifically. Well, his brief only, his brief cites it a bunch for just general principles of materiality. Correct. And as far as materiality, that has been laid down by Nieder and followed faithfully by various courts of appeal regarding what the standard is, and that's an objective standard. It's appropriate because to blame the bank or bank officers would also not only be victim blaming, but it would also be confusing again to a jury. A court is not a place to... Just for my own interest, is Mr. Diaz related to or sort of a descendant of Leander Perez? I'm not aware of that. I do not believe so. St. Bernard Parish DA? I just... I will leave that for Mr. Larson to address. Yes, sir. I do want to point out the district court here was very careful, and this was not shooting from the hip. This was a well-briefed issue. It was raised pretrial. The court denied it preliminarily. The government's motion to limit argument denied it preliminarily so that it could be raised later on. When it did come up and it was clear what the defense's arguments were regarding the bank's malfeasance and negligence, that's where the court limited it. Your Honor, I believe also as far as the harmless error argument, even if the district court did make some errors here, there was overwhelming evidence of Mr. Diaz's guilt. The bank emails were very critical. Mr. Bennett did provide some narrative of his handling of this loan, but much of his testimony was just getting in the emails, admitting the emails, contemporaneous ones between Mr. Bennett, Mr. Diaz, and Mr. Genovine, who worked with Mr. Diaz. In those emails, both Mr. Genovine and Mr. Diaz acknowledged the bank's instructions, explained they were going to spend the bank's money on the Florida warehouse in order to improve it, and then made various representations. Mr. Genovine did send many of the emails, and specifically the false invoices, and Mr. Diaz was just copying on those emails. I think the jury was very well acquainted with Mr. Diaz's conduct and could conclude that because he was copying on those emails, he read them. The emails between Genovine and Grelli, those are the two co-conspirators that were provided by a former employee of Mr. Diaz, they discussed fabricating invoices that had nothing to do with Mr. Bennett's testimony. And in those emails, it showed two co-conspirators discussing backdating invoices. One of them backdated to June 31, 2016, initially, which is a date that does not exist. The jury also heard from Robert Stone, another bank officer, who explained that he would certainly rely on representations on how the bank's money was spent. And moreover, in 2017, after the fraud was completed, Diaz claimed to him that he had repaired Florida at great expense for hundreds of thousands of dollars. That's at page 3163. Former employees of Mr. Diaz corroborated Mr. Bennett's testimony. One of them said that Mr. Diaz told him, in order to gain wealth, never spend your own money. That's at 2464. They explained that Mr. Diaz was the boss and that you had to go to Mr. Diaz before you did anything. Another witness, Jessica Jenevine, the daughter of Mr. Jenevine, the co-conspirator here, co-defendant, said that her father asked her to make these fake invoices. She did not know what the purpose was. That's why she was not fully involved in this conspiracy. Her job was simply creating these invoices for companies that either did not exist or companies that had no involvement with the improvement on the warehouse. And third-party witnesses, again, independently confirmed this. We had a lieutenant from the Lynn Haven Police Department who actually visited this warehouse during this time period and said it was kind of run down and so it attracted a lot of vagrants and that doors weren't secured so anyone could just drive right in. And finally, as we explained, business owners who confirmed that their business names were used on these fake invoices, they had nothing to do with the warehouse, and a forensic accountant for the government who simply, if you take the emails to the bank, the emails between Jenevine and Grelli, put them together and see how the fraud works, she took those that were already admitted and then simply followed the money and showed that how Mr. Diaz spent the money was diametrically opposed to how Mr. Jenevine and Diaz represented they spent the money. I know, Judge Ho, you asked about the loss calculation and intended loss. I believe we submitted a 28J letter that just recently this court confirmed that it is not error to follow the commentary that was the Casale case. That's a plain error case, as I recall. Absolutely. Have we ever dealt with this issue on the merits? I'm not aware of one. I'd be happy to provide a letter if you'd like. We can research that. It's simply a recent case that I believe, considering that posture, the language of the opinion made it clear that this was not error for at least the district court to do so. For what it's worth, are you aware that the guideline was amended on the 1st of November to make the commentary now part of the text? I am, Your Honor, yes. And so this text has basically been incorporated right into the guideline, so it looks like this might be the last time that this specific issue would be considered by the court. Well, do you understand that counsel for Diaz has agreed it was proper to consider intended loss? So my understanding is that it... Or conceded that it was proper to consider. My understanding is that they're raising it. If they are conceding it, I believe intended loss was absolutely appropriate here. I'm saying right here at oral argument he just conceded it was proper to consider intended loss. In that case, that should be settled. He's just preserving the error. Thank you. Yes, insofar as preserving the error. And the court therefore did appropriately consider that. I know that as far as his argument regarding intended loss, this intent to repay, I think there's adequate evidence that the court decided there was no intent to repay and that otherwise Mr. Diaz was consciously reckless or indifferent to this repayment of his loans. Your Honors, unless the panel has any other questions, the district court's rulings were careful and considered and the district court properly limited irrelevant evidence in this case. We ask that Mr. Diaz's conviction and sentence should be affirmed. Thank you. Okay, Mr. Larson. Judge Jones, I would point out that I reviewed the testimony on cross-examination of Mr. Bennett and there is not, I could not find a single question, and I did this recently, a single question regarding Bennett's fear of criminal exposure. And so that whole line of questioning was shut down. And that's what Davis v. Alaska and Delaware v. Van Arts all go directly to. When the line of questioning regarding fear, motive, or bias is completely terminated, you have the Sixth Amendment violation. And with regard to the question of loss, Judge Barksdale, I do want to clarify that if basically under Vargas you absolutely, Vargas says you can consider the commentary. That's what, that it's not ambiguous you go, or if you believe that you're allowed to go to the commentary to determine. But what that pretermits is first the question of, if you're going to look at the greater of intended loss or actual loss, you have to calculate both and you have to do that using the rules of commentary. And you also have to look to the case law of this court as to when it's actually appropriate in determining how you calculate intended loss. And what this court said in Goss was that if you've got a secured loan, normally intended loss doesn't apply because there's no intent. Normally somebody who puts up collateral and— That argument caught my eye to begin with, but the government says most of these properties had other prior loans, prior liens on them. Yes, they had prior liens, but Your Honor— If you're the third or fourth lien holder on a frac sand or whatever the heck it is, you're not going to get a whole lot out of foreclosure, no doubt. Actually, Your Honor, when you subtracted the liens that existed on the property, Glenn Diaz, according to FNBC's own internal records, had a net worth after subtracting all liabilities of $60 million. I understand. And that's why I asked, is he a descendant of Leander Perez? I actually don't know. Just wondering, just wondering. Okay. A lucky guy. And so— Do you have any case that says that? Because, you know, it seems to me that obviously a man who says never spend your own money, jury may infer that he doesn't have an intent to repay. He repaid every loan prior to this one, Your Honor, from other banks, and his method was his cash flow was obviously less than his expenses. There's no question about that. But in preceding loans that FNBC took note of, it was he borrows a lot of money, he lives off of that money, and then when the time comes, he sells assets to liquidate the loans. And that's what he was attempting to do here. But he had a lot of very illiquid assets. Since the bank has been taken over and the assets sold, including his loan, have any of those assets been foreclosed on? No, Your Honor, because what happened was FDIC made the decision to sell the loans. I understand. They sold the loans to a third-party lender, or a third-party vulture company, which is actually part of the Republic argument and restitution in my brief. But the third-party purchaser of those loans settled with Mr. Diaz. Okay. And that's what they did. And that was the end of that. So is it your argument that categorically, if you have put up collateral in excess of the value of the loan, that you can't be liable? It's never categorically, Your Honor. It's always a case-by-case analysis of, let's look at this situation. And the problem in this case was that the judge adopted the wrong temporal reference. She said, well, Mr. Diaz doesn't have any collateral now. Well, the intent under intended loss versus actual loss is measured at the time the offense was allegedly committed, not when it comes time for sentencing, because circumstances have changed, and Mr. Diaz's circumstances have changed. Well, I know the judge made that offhand remark, and I haven't read the whole transcript, so I'd have to look back at that. But again, do you have any case that supports your theory there? Goss and Durio, and both are cited in our opening brief. Are those bank fraud cases? I don't remember. Yes. Goss was a bank fraud case, Your Honor. All right. I'd say I'm out of time. If the Court has any other questions? No, sir, I don't think so. Thank you.